**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: | MDL NO. 2543 |
| | 1:14-MD-2543-JMF |
| GENERAL MOTORS LLC IGNITION | |
| SWITCH LITIGATION | HON. JESSE M. FURMAN |
| *This Document Relates To* | CIVIL ACTION NO: 1:15-cv-08482-JMF |
| | COMPLAINT |
| DION LANCIA, as Personal Representative | |
| of the Estate of MAUREEN LANCIA, | JURY TRIAL DEMANDED |
| Deceased, | |
| Plaintiff, | |
| v. | |
| GENERAL MOTORS LLC, | |
| Defendant. | |

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

COMES NOW individual Plaintiff (hereafter, "Named Plaintiff"), through undersigned counsel, pursuant to Court Order 141, and hereby submits this First Amended Complaint against General Motors LLC ("Defendant," "GM," or "New GM") for compensatory and punitive damages, equitable relief, and such other relief deemed just and proper arising from the injuries and deaths of Named Plaintiff Maureen Lancia which were caused by Defendant's defective ignition switches and hereby alleges:

**I.     INTRODUCTION**

1.      When people operate or ride in a motor vehicle, they trust and rely on companies to make those vehicles safe.  By failing to disclose critical information about the safety of millions of vehicles, GM violated the public's trust and disregarded public safety, resulting in devastating injuries and deaths, such those suffered by Maureen Lancia ("Named Plaintiff").

2.      Named Plaintiff's vehicles crashed as a result of her GM vehicle's defective ignition switch.  The defective ignition switch event, which will be set forth more fully herein, was proximately caused by the failure of the ignition switch in the GM vehicle transporting Named Plaintiff, and Named Plaintiff's injuries were aggravated due to the defective ignition switch event causing mechanical failures, such as failure of the power steering, brakes, and/or non-deployment of airbags.

3.      The Named Plaintiff's personal injury and/or wrongful death claims involve the following GM vehicle (hereafter, "Defective Vehicle" or "Subject Vehicle"): 2008 Chevrolet HHR (Maureen Lancia.

4.      The Defective Vehicle contains a uniformly designed ignition switch and cylinder, with the key position of the lock module on the steering column, and an ignition key at the top (hereinafter collectively referred to as the "Key System").  The Key System on these vehicles is prone to fail during ordinary and foreseeable driving situations.[1]  Each of the Defective Vehicles also contains the uniformly designed Airbag System that shuts off when the Key System on these vehicles fails during ordinary and foreseeable driving situations, such as encountering rough patches of gravel or jarring driving conditions.

---

[1]   That all of the Defective Vehicles indeed have a common safety defect, and are of a substantially similar design to one another in regard to their Key System, is evidenced by the fact that GM has identified these specific models for recall for the same safety design defects.

5.     This action arises from GM's: (1) role in the manufacture of approximately 824,000 Defective Vehicles after GM emerged from bankruptcy in July of 2009; (2) post-bankruptcy fraudulent concealment of material facts regarding the existence, extent and nature of safety defects in Defective Vehicles; and (3) its cause of the Named Plaintiff's serious injuries and/or deaths resulting from the defective manufacture and concealment.  In many instances, years after suffering injuries or dying due to an ignition switch event, Named Plaintiff received recall notices for the Defective Vehicle that caused their crash—further demonstrating GM's actual knowledge of the dangers of driving these Defective Vehicles.

6.     The Key System and Airbag System defects in the Defective Vehicles have been formally linked to at least 275 injuries and 124 deaths,[2] and GM has expressly recognized that the Key System poses an "increas[ed] risk of injury or fatality" to occupants because the ignition switch may move out of the "run" position during operation.[3]

7.     After the July 10, 2009 Bankruptcy, GM knew of pervasive problems with the Key System and Airbag System.  GM addressed some of these problems through a redesign of certain discrete elements prior to production, but it chose not to implement a comprehensive redesign that was necessary.  Rather, GM left its Defective Vehicles prone to inadvertent engine shutdown and corresponding disabling of key electrical system and safety features  (like airbags, brakes, and power steering), leaving occupants vulnerable to crashes, serious injuries, and death.

---

[2]     These numbers of crashes and deaths are taken from the GM Claims Facility Settlement Fund, but news reports have suggested the numbers of crashes and deaths associated with the Key System defects in the Defective Vehicles likely is much higher.  *See, e.g.*, March 13, 2014 letter from the Center for Auto Safety to David J. Friedman, Acting Administrator, NHTSA, *available at*:    http://www.cbsnews.com/htdocs/pdf/Friedman_Letter_March_13_2014_Full.pdf (last visited Mar. 21, 2014).  NHTSA expressed its belief that the numbers are higher as well.

[3] *See id.*

8.      At the time GM emerged from bankruptcy and began to manufacture 824,000 additional Defective Vehicles, GM knew—*based on its own engineering documents*— that the vehicles would remain prone to inadvertent shutdown unless GM: (1) redesigned the ignition switch to increase the force it could generate; (2) redesigned the ignition cylinder; (3) repositioned the ignition switch within the vehicle to prevent inadvertent driver contact with the ignition switch from moving from "on" to "accessory/off"; (4) redesigned the key that was inserted into the ignition cylinder; and (5) redesigned the Airbag System so that it would not immediately shut off when the Key System fails in ordinary and foreseeable driving situations. Rather than embark on this costly undertaking, GM modified only the ignition switch and redesigned the key in a manner designed to decrease the risk of inadvertent shutdown.  It did not redesign the cylinder.  It did not reposition the ignition switch.  It did not otherwise employ any mechanisms to prevent inadvertent driver contact with the switch.  Significantly, it did not redesign the Airbag System so that it would not immediately shut off when the Key System fails in ordinary and foreseeable driving situations.

9.      Acknowledging its culpability, in September 2015, GM agreed to pay $900 million dollars as part of a criminal plea agreement with the United States Department of Justice in order to end certain criminal investigations.  As a part of that agreement, *GM admitted to defrauding customers*, including Named Plaintiff, by marketing its vehicles as safe when, in fact, GM knew of the defective ignition switches and the danger they posed.  In addition to admitting to defrauding customers, the Department of Justice will monitor GM's recall process for three years in an effort to make sure that GM does not repeat this tragedy.

10.     Through this action, Named Plaintiff, individually, seek compensatory and punitive damages, equitable relief, and any other relief deemed proper for injuries suffered as a result, or exacerbated by, defective ignition switch devices.

## II.    PARTIES

11.     Plaintiff Dion Lancia, on behalf of the Estate of Maureen Lancia, his mother, is a citizen and resident of Yukon, Oklahoma in Canadian County.  Maureen Lancia was killed, along with her husband Mario Lancia who is a Plaintiff in a separate action against GM, in the automobile crash that resulted from the defective ignition switch in their 2008 Chevrolet HHR. The details of the crash that took their lives are described more fully herein.

12.     Defendant General Motors LLC ("New GM" or "GM") is a citizen of Delaware and Michigan, and does business in all fifty states, including the State of Michigan. General Motors LLC's principal place of business is located in Detroit, Michigan.

13.     Defendant General Motors LLC does business in the State of New York with its principal domestic address located at Corporation Service Company, 80 State Street, Albany, New York 12207.

14.     General Motors LLC is a limited liability company with one member: General Motors Holding, LLC.  General Motors Holding, LLC is a citizen of Delaware and Michigan, and is a holding company and direct parent of General Motors LLC. General Motors Holding, LLC is a limited liability company with one member: General Motors Company. General Motors Company is a citizen of Delaware and Michigan and is publicly traded.

15.     General Motors Corporation ("Old GM") was a Delaware corporation with its headquarters in Detroit, Michigan. General Motors Corporation, through its various entities, designed, manufactured, marketed, distributed, and sold Chevrolet, Saturn, and other brand

automobiles in Oklahoma, Michigan, West Virginia, Indiana, elsewhere in the United States, and worldwide.

16.    In June of 2009, Old GM filed for bankruptcy.  On July 9, 2009, the United States Bankruptcy Court approved the sale of substantially all of Old GM's assets to Defendant General Motors LLC pursuant to a Master Sales and Purchase Agreement ("Agreement").  The Agreement became effective on July 10, 2009.

17.    The Agreement defines Defendant's "Purchased Assets" as:

> (xiv) all books, records, ledgers, files, documents, correspondence, lists, plats, specifications, surveys, drawings, advertising and promotional materials (in whatever form or medium), including Tax books and records and Tax Returns used or held for use in connection with the ownership or operation of the Purchased Assets or Assumed Liabilities, including the Purchased Contracts, customer lists, customer information and account records, computer files, data processing records, employment and personnel records, advertising and marketing data and records, credit records, records relating to suppliers, legal records and information and other data;

> (xv) all goodwill and other intangible personal property arising in connection with the ownership, license, use or operation of the Purchased Assets or Assumed Liabilities; . . . .

AMENDED AND RESTATED MASTER SALE AND PURCHASE AGREEMENT at Section 2.2.

18.    Along with the Purchased Assets, GM also expressly took on a range of liabilities. "Liabilities" is defined the Agreement as "any and all liabilities and obligations of every kind and description whatsoever, whether such liabilities or obligations are known or unknown, disclosed or undisclosed, matured or unmatured, accrued, fixed, absolute, contingent, determined or undeterminable, on or off-balance sheet or otherwise, or due or to become due, including Indebtedness and those arising under any Law, Claim, Order, Contract or otherwise."

19.    Among many others, the Liabilities assumed by GM under the Agreement include:

> (vii) (A) all Liabilities arising under express written warranties of Sellers [i.e., old GM] that are specifically identified as warranties and delivered in connection with sale of new, certified used or pre-owned vehicles or new or remanufactured motor vehicle parts and equipment (including service parts, accessories, engines and transmissions) manufactured or sold by Sellers or Purchaser [i.e., new GM] prior to or after the Closing and (B) all obligations under Lemon Laws; . . .

> (ix) all Liabilities to third parties for death, personal injury, or other injury to Persons or damage to property caused by motor vehicles designed for operation on public roadways or by the component parts of such motor vehicles and, in each case, manufactured, sold or delivered by Sellers (collectively, "Product Liabilities"), which arise directly out of accidents, incidents, or other distinct and discreet occurrences that happen on or after the Closing Date and arise from such motor vehicles' operation or performance;[1] . . .

> (xi) all Liabilities arising out of, relating to, in respect of, or in connection with the use, ownership or sale of the Purchased Assets after the Closing; . . .

20.    GM also assumed responsibility for compliance with a wide range of laws and other regulations, including:

> (a) From and after the Closing, Purchaser [Defendant GM] shall comply with the certification, reporting, and recall requirements of the National Traffic and Motor Vehicle Safety Act, the Transportation Recall Enhancement, Accountability and Documentation Act, the Clean Air Act, the California Health and Safety Code and similar Laws, in each case, to the extent applicable in respect of vehicles and vehicle parts manufactured or distributed by Seller [Old GM].

> (b) From and after the Closing, Purchaser [Defendant GM] shall be responsible for the administration, management and payment of all Liabilities arising under (i) express written warranties of Sellers [Old GM] . . . (ii) Lemon Laws.

21.    The Bankruptcy Court order approving the Agreement made clear that Defendant GM assumed "the warranty and recall obligations of both Old GM and [Defendant GM]."

22.    Pursuant to the Agreement and other orders of the Bankruptcy Court, Defendant GM continued the business of Old GM with many, if not most, of Old GM's employees and,

on information and belief, with most of the same senior-level management, officers, and directors.

23.     The allegations pertaining to Old GM above are included for purposes of background and context, and to set forth the scope of Defendant GM's liabilities and responsibilities under the Agreement. This Complaint does not assert causes of action against Old GM; all causes of action and attributions of liability are directed solely against New GM.

### III.     JURISDICTION AND VENUE

24.     This Court has jurisdiction over these matters pursuant to Case Management Order No. 8 in *In re General Motors LLC Ignition Switch Litig.* [14-MC-2543, Dkt. No. 36] Named Plaintiff has not waived the right to transfer to another proper jurisdiction after the pretrial proceedings in this district.  Named Plaintiff also has not altered the substantive law governing their claims by filing in this district.   After pre-trial proceedings in this district conclude, Named Plaintiff may transfer her claims to a District Court of Proper Jurisdiction, which is as follows: the United States District Court for the Western District of Oklahoma for Dion Lancia as Personal Representative of the Estate of Maureen  Lancia.

25.     This Court has diversity jurisdiction over this action pursuant  to 28 U.S.C. § 1332 because the amount in controversy as to the Named Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because Defendant is citizens of states other than the state in which Named Plaintiff are citizens.

26.     Venue in this district is proper under 28 U.S.C. § 1407.

### IV.     NAMED PLAINTIFF'S FACTUAL ALLEGATIONS

27.     The Named Plaintiff repeats, reiterates, and re-alleges each and every allegation of this First Amended Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

28.     New GM expressly assumed liability for post-sale accidents involving Old GM that caused personal injury, property damage, or death.  Additionally, New GM had knowledge of Old GM's handling of the defective ignition switch through existing employees and books and records which were acquired as a result of the Agreement and Sale Order.  The Named Plaintiff, as detailed more fully below, has claims for post-sale accidents involving Old GM vehicles that caused personal injury and loss of life.  New GM is liable to the following Named Plaintiff who suffered injuries and/or deaths of their loved ones:

### *Dion Lancia, on behalf of his deceased mother, Maureen Lancia*

29.     Dion Lancia is the Personal Representative of the Estate of Maureen Lancia and brings this action against GM for the defective ignition switch that caused the death of his mother. The defective ignition also took the life of his mother Maureen Lancia, who also brought suit against GM in a separate action.


30.     On November 13, 2011, Mario was driving Maureen and the two were traveling eastbound on Black Kettle Road in Reno, Oklahoma.  According to the police report, the Lancia's 2008 Chevrolet HHR failed to come to a complete stop at a stop sign at the intersection of Black Kettle Road and U.S. Highway 81.  A vehicle traveling south on U.S. Highway 81 struck the Lancia's vehicle, causing it to go off the road and roll over after impact.

31.     At the time of the crash, Maureen  was wearing her seatbelt.  Despite the forceful impact of the crash, the airbags in their 2008 Chevrolet HHR failed to deploy.

32.     After impact, Maureen was transported to the hospital.  She was pronounced dead of multiple blunt force injuries.

33.     The 2008 Chevrolet HHR's airbags failed to deploy and/or the brakes and power steering systems failed due to the ignition switch defect.   If the airbags had operated properly and deployed, Maureen may have avoided or at least survived the crash.

34.     Prior to the crash on November 13, 2011, GM knew of the design defect in the 2008 Chevrolet HHR, yet failed to disclose the design defect or warn the drivers of those vehicles.  Rather, Defendant intentionally, purposely, fraudulently, and systematically concealed the defect from Maureen  Lancia, the federal government, and the public.

35.     It was not until three years after Maureen  Lancia's death when GM announced three recalls on their vehicle, the 2008 Chevrolet HHR.  GM belatedly announced recalls of the ignition switch, ignition lock cylinder, and ignition key in April 2014.

36.     After Maureen 's death, GM sent multiple recall notices to their home where they were received by Dion Lancia.

37.     Accordingly, Dion Lancia, on behalf of Maureen Lancia, brings this action against GM for negligence, strict liability, false misrepresentation, violation of the Oklahoma Consumer Protection Act, and punitive damages under applicable Oklahoma law.  The full background and extent of GM's conduct surrounding its intentional and reckless concealment of the defective ignition switch is discussed in greater detail in Section V of this Complaint.

**V.    GM'S UNSCRUPULOUS CONDUCT**

*At its Inception, New GM Made a Conscious Decision to Mislead Customers About the Existence and Nature of Vehicle Defects and to Produce and Sell Additional Defective Vehicles, Knowing that this Conduct Presented Risk of Serious Injury and Death.*

38.    Defendant General Motors LLC ("New GM" or "GM") has been an independent legal entity since July 10, 2009.  From the moment of its inception, it knew that Old GM had manufactured and sold millions of vehicles suffering from fatal defects.  These vehicles were all prone to sudden and inadvertent shutdown during normal operation, cutting off engine power and certain electrical systems in the cars, which, in turn, disables key vehicle components, safety features (like airbags), or other vehicle functions, leaving occupants vulnerable to crashes, serious injuries, and death.

39.    Rather than promptly recalling these vehicles in 2009, GM fraudulently concealed the existence of the safety defects in these vehicles.  Worse yet, GM decided to manufacture an additional 824,000 Defective Vehicle that shared the same principal defect after it emerged from bankruptcy.  Although Defendants made certain design modifications prior to production of the post-bankruptcy vehicles, Defendants were well aware that these design modifications were insufficient to make these vehicles safe and defect free.

40.    The first evidence of a defect was identified in 2001 when pre-production testing of the 2003 Saturn Ion revealed the vehicle's ignition switch could unintentionally move from the "run" to the "accessory" or "off" position, and GM prior to bankruptcy ("Old GM") confirmed that the ignition switch it manufactured did not meet the specifications.  Old GM nonetheless decided to incorporate the defective switch into millions of vehicles.  As discussed in greater detail below, over the following years, a number of current GM senior executives and engineers continued to learn more about the defect while employed by Old GM.  They carried all of this knowledge with them the moment they became employees of Defendant New GM on July 10, 2009.

41.     By 2004, engineers of Old GM determined that the ignition switch on the Saturn Ion was so weak and so low on the steering column that the driver's knee could easily bump the key and turn off the car and affirmatively concluded that "[t]his is a basic design flaw and should be corrected if we want repeat sales."   Management of Old GM nonetheless ignored these engineers and incorporated the defective ignition switch into other Defective Vehicles, including the 2005 Chevrolet Cobalt.

42.     Upon receipt of a number of internal and external reports that Cobalt vehicles suddenly lost engine power because the ignition switch inadvertently moved out of the "run" position during vehicle operation—including evidence of deaths caused by the problem—Old GM opened several engineering inquiries known as a Problem Resolution Tracking Systems (PRTSs) with the goal of identifying and evaluating potential solutions to this problem.

43.     By the closure of the last of these PRTSs in May of 2005, Old GM had extensive knowledge of the nature of the defect and knew what needed to be done to fix the defect.[4]   Old GM engineers, along with the manufacturers of the ignition switch, determined and affirmatively documented that the only "sure solution" to fixing the problem of the key inadvertently moving from the "run" to the "accessory/off" position required *both*: (1) changing from a low mount to a high mount lock module, which would considerably reduce the possibility of the key/key fob being impacted by a driver; and (2) increasing the detent in the ignition switch.

44.     Old GM Engineer Gary Altman rejected this solution largely based on his belief that cost of implementation would be too high (even though the cost would have been under $1 per vehicle).   As a mid-level engineer, however, Altman was not the final decision maker and did not have the authority to veto the "sure solution" alone.   Nor did he.   Details about the nature of

---

[4] The ignition cylinder is a discrete element of the Key System that is both independently defective and increases the likelihood that a Defective Vehicles will experience sudden and inadvertent loss of power by virtue of the ignition cylinder's integration into the Key System.

the defect escalated far higher in Old GM's corporate ladder.  Despite receiving comprehensive briefing on the nature of the defect and material safety risk it posed to drivers, passengers, and the public, GM Chief Engineer Doug Parks and GM Vehicle Line Executive Lori Queen approved Altman's rejection of the "sure solution."

45.     Parks, Queen, and Altman also rejected a less effective repair solution, dubbed" the "containment solution", which was recommended by a joint GM/Ortech (ignition switch manufacturer) coalition composed of GM Craig St. Pierre, an Ortech employee who was heavily involved in the design and development of the ignition cylinder, Ortech engineering manager Brian Bolton, and David Trush, a GM employee who had served as GM's lead design engineer for the ignition cylinder and key.  The containment solution would have entailed changing the slot in the vehicle key to a hole and using a smaller key ring to assist in eliminating the problem of inadvertent vehicle shutdown.  Although not as effective as the "sure solution", GM and Ortech engineering documents confirm that the key change would have significantly reduced the chance of the key inadvertently moving from the "run" to the "accessory/off" position during ordinary and foreseeable driving situations.

46.     Parks, Queen, and Altman knew that the Defective Vehicles possessed a defect that created a material risk of inadvertent vehicle shutdown, knew the potential consequences of such shutdown, and knew that this defect was fixable.  By virtue of their refusal to implement any solution, they refused to fix, or even mitigate, this defect.  From the day they became employees of Defendant GM on July 5, 2009, the refusal to repair the defect and fraudulent concealment of the defect continued.[5]  Thus, they knowingly concealed and allowed this defect

---

[5] Parks and Altman continue to serve as GM employees, although Altman has been suspended.  Upon information and belief, Queen retired in 2009 shortly after joining GM.

to persist for years. During GM's period of concealment, Named Plaintiff crashed as a result of the ignition switch defects and died.

47. Parks, Queen and Altman were far from the only individuals who learned of the vehicle defects as employees of Old GM and fraudulently concealed their existence as employees of Defendant GM. Raymond DeGiorgio, the lead design engineer for the Cobalt and Ion ignition switch, also learned that the ignition switches were contributing to the crashes and fatalities as an employee of Old GM. As an employee of Old GM, DeGiorgio did nothing to repair the defective ignition switch. Rather, he actively impeded and engineered a delay of modifications to the ignition switch.

48. When Old GM did modify the ignition switch, DeGiorgio ensured that the replacement switch was given the same part number as the original defective switch in order to conceal the fact that the defective switch was modified.[6] Later, as an employee of Defendant GM, DeGiorgio continued to conceal this fact, facilitating GM's avoidance of recalling the Defective Vehicles. DeGiorgio went so far as to deny under oath at a deposition that any such switch change had taken place. The information revealed at DeGiorgio's deposition and the deposition of other GM employees further entrenched the knowledge of the vehicle defects in GM senior management, who continued to fraudulently conceal them.

49. Knowledge of the Defective Vehicles went well beyond senior engineering executives employed by Old GM. It was also known at Old GM's most senior executive levels, including by Old GM's legal department. As Associate General Counsel of Old GM, Michael P.

---

[6] At present, it is unclear whether the later model ignition switches, including those currently being installed as replacements in recalled vehicles, remain defective. Defective Vehicles manufactured by GM after the Bankruptcy continue to experience inadvertent shutdown and corresponding disablement of airbags and other key safety features. It is not clear whether this is attributable to GM's failure and refusal to modify the positioning and placement of the ignition switches, continued defects in the ignition cylinder and/or a Defective Airbag System alone, or whether an independently defective ignition switch continues to be a contributing factor. This will become clear only through discovery.

Milliken learned that the Key System and Airbag system in the Defective Vehicles posed a safety hazard, including the possible loss of vehicle control, power, and airbag non-deployment. He learned of this, in large part, from his involvement in the investigation of situations where Defective Vehicles experienced inadvertent shutdown, including his involvement in threatened and realized civil litigation stemming from injuries and deaths caused by improper vehicle shutdown. Milliken retained this knowledge when he became Vice President and General Counsel of Defendant GM on July 10, 2009—the day of its inception—and at all points thereafter.

50.    Between 2006 and 2009, Old GM learned of at least a dozen cases in which airbags failed to deploy after Defective Vehicles crashed as a result of inadvertent vehicle shutdown. In many, if not most of these cases, Old GM obtained a report and Sensing and Diagnostic Module ("SDM") data from its Airbag supplier, Continental.

51.    In short, from GM's inception as a legal entity, Milliken, Parks, Queen, DeGiorgio, Trush, and Altman (among others) knew the existence, nature and extent of the defects as well the necessary corrective means to repair them. Based on this knowledge, Defendant engaged in gross misconduct by: (1) failing to immediately recall and repair existing Defective Vehicles; (2) manufacturing, selling, and advertising an additional 824,000 Defective Vehicles with only minimal modifications that were insufficient to make the vehicles safe, defect free, and of the advertised economic value; and (3) misleading the public through affirmative misrepresentations and material omissions as to the safety profile of the Defective Vehicles.

52.    Over the next 4 ½ years leading up to the first recall, the knowledge of the aforementioned employees and other employees only grew as drivers of the Defective Vehicles, such as Named Plaintiff, continued to experience inadvertent vehicle shutdown, continued to

experience the disablement of important safety features in their vehicles as a result of this shutdown, continued to crash, and continued to sustain injury and death.

53.    In March 2010, GM recalled nearly 1.1 million Cobalt and Pontiac G5 models for faulty power steering issues.  .  Despite its knowledge of the ignition switch defect, GM did not include the ignition switch defect in this recall.  Further, although the Saturn Ion used the same steering system as the Cobalt and Pontiac G5 (and had the same ignition switch defect), GM did not recall any Saturn Ion vehicles at this time.

54.    Despite receiving notice of numerous accidents and deaths in 2010, and despite pre-existing knowledge that modifications to the positioning of the ignition switch combined with modifications was the only "sure solution" reasonably calculated to  resolve the defect, GM chose not to implement a recall and made no attempt to repair the pre-bankruptcy Defective Vehicles.  Instead, it allowed the Defective Vehicles to remain on the market in their defective state and even issued new warranties representing that the vehicles were safe, in sound condition, and of economic value.  Nor did GM make any modification to the Airbag System, even though it knew the system would not deploy if the Defective Key System caused a Defective Vehicle to power off.  GM began producing additional Defective Vehicles, knowing that these vehicles were unsafe as a result of the positioning of their ignition switches.

55.    In February 2011, current CEO Mary Barra became Senior Vice President of Global Product Development, which was the engineering department in which Ray DeGiorgio, designer of the defective ignition switches, worked.  In this role, Ms. Barra was responsible for the design, engineering, program management, and quality of GM vehicles around the world. This role made Ms. Barra responsible for safety investigations and recalls.  One of GM's top engineers, Jim Federico, reported directly to Ms. Barra in this role.  As discussed below, Jim

Federico knew about the ignition switch defects by 2012 (if not earlier).  Although Ms. Barra has

disclaimed knowledge of any problems with the ignition switch until 2014, upon information and

belief, Ms. Barra recklessly, if not willfully, disregarded evidence of the ignition defect that was

in her possession.

### *GM Investigates Further, but Continues to Conceal the Defect*

56.    In 2010, GM began a formal investigation of the frontal airbag non-deployment

incidents in Chevrolet Cobalts and Pontiac G5s.  GM subsequently elevated the investigation to a

Field Performance Evaluation ("FPE").

57.    In August 2011, GM assigned Engineering Group Manager, Brian Stouffer as the

Field Performance Assessment Engineer ("FPAE") to assist with the FPE investigation.

58.    In early 2012, Brian Stouffer asked Jim Federico to oversee the FPE investigation

into frontal airbag non-deployment incidents.  Federico was the "executive champion" for the

investigation to help coordinate resources.

59.    In May 2012, GM engineers tested the torque on the ignition switches for 2005-

2009 Cobalt, 2007, 2009 Pontiac G5, 2006-2009 HHR, and 2003-2007 Ion vehicles in a

junkyard.  The results of these tests showed that the torque required to turn the ignition switches

in most of these vehicles from the "run" to the "accessory/off" position did not meet GM's

minimum torque specification requirements, including the 2008-2009 vehicles.  These results

were reported to Stouffer and other members of the FPE.

60.    In September 2012, Stouffer requested assistance from a "Red X Team" as part of

the FPE investigation.  The Red X Team was a group of engineers within GM assigned to find

the root cause of the airbag non-deployments in frontal accidents involving Chevrolet Cobalts

and Pontiac G5s. By that time, however, it was clear that the root cause of the airbag non-deployments in a majority of the frontal accidents was the defective Key System.

61.     Indeed, Mr. Stouffer acknowledged in his request for assistance that the Chevrolet Cobalt could experience a power failure during an off road event, or if the driver's knee contacted the key and turned off the ignition. Mr. Stouffer further acknowledged that such a loss of power could cause the airbags not to deploy.

62.     At this time, GM still withheld this information from NHTSA and or the public. GM did not redesign the Defective Airbag System, GM did not redesign the Defective Key System, and GM did not institute any recalls of the Defective Vehicles. GM made no changes whatsoever. Acting NHTSA Administrator David Friedman recently stated, "at least by 2012, GM staff was very explicit about an unreasonable risk to safety" from the ignition switches in the Defective Vehicles. Mr. Friedman continued: "GM engineers knew about the defect. GM lawyers knew about the defect. But GM did not act to protect Americans from the defect."

63.     Notably, the field-performance-evaluation ("FPE") process did not reveal anything new. It simply confirmed what many high-level GM executives and engineers had long known. During the FPE process, GM reconfirmed that, although increasing the detent in the ignition switch would reduce the chance that the key would inadvertently move from the "run" to the "accessory/off" position, it would not be a total solution to the problem.

64.     GM engineers identified several additional ways to actually fix the problem. These ideas included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position, and adding a push button to the lock cylinder to prevent it from slipping out of run. GM rejected each of these ideas.

65.    The photographs below are of a GM engineer in the driver's seat of a Cobalt during the investigation of Cobalt engine stalling incidents. Note the proximity of the driver's knee to the ignition key:



66.    These photographs show the dangerous condition of the position of the key in the lock module on the steering column, as well as the key with the slot, which allow the key fob to hang too low off of the steering column.  GM engineers understood that the key fob may be impacted and pinched between the driver's knee and the steering column which causes the key to be inadvertently turned from the run to accessory/off position.  The photographs show why the GM engineers understood that increasing the detent in the ignition switch would not be a total solution to the problem.  It also shows why GM engineers have known that additional changes to the Key System (such as the shroud) were necessary to fix the defects with the Key System.

67.    The GM engineers clearly understood that increasing the detent in the ignition switch alone was not a solution to the problem but GM continuously concealed the pervasive nature and extent of the defects from the public.  GM continues to refuse to utilize a shroud or otherwise reposition the ignition switch so that is not subject to inadvertent contact with drivers' body parts.

19

68.    On October 4, 2012, there was a meeting of the Red X Team during which Federico gave an update of the Cobalt airbag non-deploy investigation.  According to an email from Stouffer on the same date, the "primary discussion was on what it would take to keep the SDM active if the ignition key was turned to the accessory mode."  Despite this renewed confirmation by GM engineers that the SDM should remain active if the key is turned to the accessory/off mode, GM still did nothing to remedy this safety-related defect and fraudulently concealed, and continues to fraudulently conceal it, from the public.

69.    During the October 4, 2012 meeting, Stouffer, and the other members of the Red X Team also discussed "revising the ignition switch to increase the effort to turn the key from Run to Accessory."

70.    On October 4, 2012, at 9:07 p.m., Stouffer emailed DiGeorgio and asked him to "develop a high level proposal on what it would take to create a new switch for service with higher efforts."  On October 5, 2012, at 7:39 a.m., DeGiorgio responded:

> Brian,
>
> In order to provide you with a HIGH level proposal, I need to understand what my requirements are.  what is the TORQUE value that you desire?
> Without this information I cannot develop a proposal.

71.    At 9:05 am on that same day, Stouffer responded to DeGiorgio's email:

> Ray,
>
> As I said in my original statement, I currently don't know what the torque value needs to be.  Significant work is required to determine the torque.  What is requested is a high level understanding of what it would take to create a new switch.

72.    DeGiorgio replied to Stouffer at 9:33 am that same morning:

> Brian,
>
> Not knowing what my requirements are I will take a SWAG at the Torque required for a new switch.  Here is my level proposal

**Assumption is 100 N cm Torque.**

New switch design = Engineering Cost Estimate approx. $300,000

Lead Time = 18 – 24 months from issuance of GM Purchase Order and supplier selection.

Let me know if you have any additional questions.

73.     Stouffer admitted during his deposition that DeGiorgio's reference to SWAG was an acronym for "Silly Wild-Ass Guess."

74.     DeGiorgio's cavalier attitude exemplifies GM's longstanding approach to the safety-related defects that existed and still exist in the Key System and Airbag System in the Defective Vehicles.   Rather than seriously addressing the safety-related defects in the Key System, DeGiorgio's emails show he understood the ignition switches were contributing to the crashes and fatalities but did not care.

75.     It is also obvious from this email exchange that Stouffer, who was a leader of the Red X Team, had no problem with DeGiorgio's cavalier and condescending response to the request that he evaluate the redesign of the ignition switches.

76.     Federico, Stouffer, and the other members of the Red X Team also understood that these safety-related defects had caused or contributed to numerous accidents and multiple fatalities.   Despite this knowledge, GM chose to continue to conceal this information from the public.

77.     Under 49 C.F.R. § 573.6, GM had a duty in 2012 to disclose the safety-related defects in the Ion, Cobalt, and G5.   Rather than comply with its legal obligations, GM continued to fraudulently conceal these defects from the public and the U.S. government.

21

78.     GM engineers integrally involved with this situation have admitted that GM never should have sold the Defective Vehicles with ignition switches that did not meet its minimum torque performance requirements.

79.     On April 29, 2013, Ray DeGiorgio, the chief design engineer for the ignition switches in the Defective Vehicles was deposed in Detroit, Michigan.  At his deposition, Mr. DeGiorgio was shown photographs of the differences between the ignition switch in a defective Cobalt and the ignition switch in the 2008 Cobalt or replacement ignition switch.  After looking at the photographs of the different ignition switches, Mr. DeGiorgio testified as follows:

Q.  The one on the right, Exhibit 13 is an '05 or an '06, and the one on the left, Exhibit 14, is either an '08 or replacement.  Do you see the difference?

THE WITNESS: Yes.

Q.  Have you noticed that before today, Mr. DeGiorgio?

THE WITNESS: No sir.

Q.  Were you aware of this before today, Mr. DeGiorgio?

MR. HOLLADAY:  Object to the form. You can answer.

THE WITNESS:  No sir.

Q.  It appears to be pretty clear that the plunger and the cap is taller on Exhibit 14 compared to Exhibit 13, isn't it?

THE WITNESS: That's correct.

Q.  How is a taller cap going to affect the rotational resistance?

THE WITNESS: It's hard to determine from these pictures exactly if it is a taller cap or is it recessed inside the housing or not.  It's hard for me to assess, really, what I'm looking at.

Q.  You've taken apart a number of switches and you're telling the jury you've never noticed the difference in the plunger between the '05 and '06 versus the new resistor or switch?

MR. HOLLADAY:  Object to the form.

THE WITNESS:  I did not notice, no.

(DeGiorgio Deposition, pp. 149-150)

80.     Mr. DeGiorgio was then further questioned about his knowledge of any differences in the ignition switches:

Q.  And I'll ask the same question.  You were not aware before today that GM had changed the spring – the spring on the ignition switch had been changed from '05 to the replacement switch?

MR. HOLLADAY:   Object to the form.   Lack of predicate and foundation.  You can answer.

THE WITNESS:  I was not aware of a detent plunger switch change.  We certainly did not approve a detent plunger design change.

Q.  Well, suppliers aren't supposed to make changes such as this without GM's approval, correct?

THE WITNESS: That is correct.

Q.  And you are saying that no one at GM, as far as you know, was aware of this before today?

MR. HOLLADAY:  Object.  Lack of predicate and foundation.  You can answer.

THE WITNESS:  I am not aware about this change.

(DeGiorgio Deposition, pp. 151-152)

81.     Mr. DeGiorgio's testimony left no doubt that he unequivocally disclaimed any knowledge of any change in the ignition switch in 2005-2010 Cobalts.

82.     Mr. DeGiorgio signed his errata sheet on May 23, 2013.  In the signed errata sheet, Mr. DeGiorgio did not change any testimony referenced in this Complaint.

83.    On June 12, 2013, Mr. Altman, the Cobalt program engineering manager, testified as follows during his deposition in *Melton v. GM*:

> Q.   And the vehicle never should have been sold if it didn't meet GM's minimum torque specific – performance requirements, should it?
>
> MR. FRANKLIN:  Object to form.
>
> THE WITNESS:  That's correct.
>
> Q.    And the reason is because that could be dangerous under certain situations, because the key can move from run to accessory?
>
> MR. FRANKLIN:  Object to form.
>
> THE WITNESS:  Yes.
>
> (Gary Altman Depo., pp. 23-24)

*84.*    All of these incidents—as well as all of the GM documents that were included as the "Purchased Assets" for new GM—gave Defendant GM actual knowledge of the defects in the Key System in the Defective Vehicles.  Notwithstanding those facts, coupled with its successor liability based on the above-described fraudulent concealment of the problems with the Defective Vehicles, Defendant GM continued to fraudulently conceal the nature and extent of the defects from the public, inducing customers to reasonably continue to own and operate or purchase Defective Vehicles with no knowledge of the existence of these serious and uniform defects.

### *GM Conceals Information Regarding the Saturn Ion Ignition Switch and Abuses Use of Service Bulletins*

85.    In September 2011, after the NHTSA began to make inquiries about the safety of the Saturn Ion, GM acknowledged that it had received almost 3,500 customer reports claiming a sudden loss of power steering in 2004-2007 Ion vehicles.

86.    The following month, a GM engineer informed Mary Barra that the Saturn Ion may have the same power steering issues that plagued the Chevy Cobalt and Pontiac G5.

87.    Instead of recalling the Saturn Ion, GM sent dealers a service bulletin in May of 2012 identifying complaints about the steering system in the vehicle.

88.    By the time GM finally recalled the Saturn Ion in March 2014, NHTSA had received more than 1,200 complaints about the vehicle's power steering.  Similar complaints resulted in over 30,000 warranty claims with GM.

89.    According to an analysis by the New York Times published on April 20, 2014, GM has "repeatedly used technical service bulletins to dealers and sometimes car owners as stopgap safety measures instead of ordering a timely recall."

90.    Former NHTSA head Joan Claybrook echoed this conclusion, stating, "There's no question that service bulletins have been used where recalls should have been."

91.    In addition, GM has been recently reprimanded by NHTSA for issuing service bulletins where product recalls were more appropriate.  In July 2012, GM issued a service bulletin for what NHTSA later called a "fairly obvious" safety concern over defective airbags in the Buick Verano and Chevrolet Cruze vehicles.  GM later recalled some of these vehicles in October 2012; it expanded that recall in January 2013; it expanded the recall again in November 2013.

92.    NHTSA has recently criticized GM for issuing service bulletins on at least four additional occasions in which a recall would have been more appropriate and in which GM later, in fact, recalled the subject vehicles.

93.    These inappropriate uses of service bulletins prompted Frank Borris, the top defect investigator for NHTSA, to write to GM's product investigations director, Carmen

Benavides, in July 2013, complaining that "GM is slow to communicate, slow to act, and, at times, requires additional effort . . . that we do not feel is necessary with some of [GM's] peers."

94.    Mr. Borris' correspondence was circulated widely among GM's top executives. Upon information and belief, the following employees received a copy: John Calabrese and Alicia Boler-Davis, two vice presidents for product safety; Michael Robinson, vice president of regulatory affairs; Jim Federico; Gay Kent, director of product investigations who had been involved in safety issues with the Cobalt since 2006; and William Kemp, an in-house product liability lawyer.

### GM Issues a Recall – Ten Years Too Late

95.    On February 7, 2014, GM, in a letter from Carmen Benavides, Director – Product Investigations and Safety Regulations for GM, informed NHTSA that it was conducting Recall No. 13454 for certain 2005-2007 model year Chevrolet Cobalts and 2007 model year Pontiac G5 vehicles.

96.    In its February 7, 2014 letter to NHTSA, GM represented that as replacement ignition switches became available, GM would replace the ignition switches on the Defective Vehicles.

97.    On February 19, 2014, a request for timeliness query of General Motors' Safety Recall 13454 was sent to NHTSA ("timeliness query").  The timeliness query pointed out that GM had failed to recall all of the vehicles with the defective ignition switches.

98.    The February 19, 2014 timeliness query also asked NHTSA to investigate GM's failure to fulfill its legal obligation to report the safety defects in the Defective Vehicles to NHTSA within five days of discovering the defect.

99.     On February 24, 2014, GM sent a letter to Ms. Benavides and informed NHTSA that it was expanding the recall to include 2006-2007 model year (MY) Chevrolet HHR and Pontiac Solstice, 2003-2007 MY Saturn Ion, and 2007 MY Saturn Sky vehicles.

100.    GM included an Attachment to the February 24, 2014 letter.   In the Attachment GM, *for the first time*, admitted that GM authorized a change in the ignition switch in 2006. Specifically, GM stated:

> On April 26, 2006, the GM design engineer responsible for the Cobalt's ignition switch signed a document approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics.  The approved changes included, among other things, the use of a new detent plunger and spring that increased torque force in the ignition switch.  This change to the ignition switch was not reflected in a corresponding change in the part number for the ignition switch. GM believes that the supplier began providing the re-designed ignition switch to GM at some point during the 2007 model year.

101.    GM then produced more than 200,000 pages of documents in response to Congressional requests leading up to the hearings April 1 and 2, 2014.

102.    Among these internal GM documents, there is a 2011 email communication from Terry Woychowski, a senior GM engineer, to Mary T. Barraand copied to William Kemp, a top GM safety attorney.  The email alerted Ms. Barra to widening problems with power steering in the Cobalt, Pontiac G5, and Saturn Ion.  While the email did not focus on the defects in the Key System and Airbag System at issue in this case, it does suggest that Ms. Barra was made aware of safety problems in the Defective Vehicles earlier than she has stated in testimony to Congress.

103.    The documents produced by GM also included a document titled, "GENERAL MOTORS COMMODITY VALIDATION SIGN-OFF," dated April 26, 2006.  According to this document, Delphi had met all of the sign-off requirements in order to provide a new ignition switch for certain GM vehicles.  GM has acknowledged that the ignition switch in the Cobalt was included in this design change.

104.    The design change included a new detent plunger "to increase torque force in the switch."  Mr. DeGiorgio's signature is on this page as the GM authorized engineer who signed off on this change to the ignition switch.

105.    This GM Commodity Validation Sign-Off is fundamentally at odds with Mr. DeGiorgio's sworn testimony on April 29, 2013.  Mr. DeGiorgio has fraudulently concealed evidence that GM had signed off on the change in the ignition switch.  Mr. DeGiorgio signed the errata sheet confirming his misleading assertion that all of his the testimony was true and accurate.

106.    On March 17, 2014, Mary T. Barra, General Motors' chief executive issued an internal video, which was broadcast to employees.  In the video, Ms. Barra admits:

> Scrutiny of the recall has expanded beyond the review by the federal regulators at NHTSA, the National Highway Traffic Safety Administration.  As of now, two congressional committees have announced that they will examine the issue.  And it's been reported that the Department of Justice is looking into this matter.  . . . ***These are serious developments that shouldn't surprise anyone***.  After all, ***something went wrong with our process in this instance and terrible things happened.***  . . . The bottom line is, ***we will be better because of this tragic situation***, if we seize the opportunity.  . . . I ask everyone to stay focused on making today's GM the best it can be.[7]

107.    On March 28, 2014, GM again expanded the ignition switch recall to cover all model years of the Chevrolet Cobalt and HHR, the Pontiac G5 and Solstice and the Saturn Ion and Sky in the United States.  According to reports, this second expansion of the ignition switch recall covered an additional 824,000 vehicles in the U.S., bringing the number of recalled vehicles to 2,191,146.

108.    On April, 10, 2014, GM again expanded its recall to address issues with the ignition cylinders of the Defective Vehicles.  As part of this expansion, GM is providing a

---

[7]    *See*    http://media.gm.com/media/us/en/gm/news.detail.html/content/Pages/news/us/en/2014/mar/0317-video.html (last visited Mar. 21, 2014) (emphasis added).

redesigned key that utilizes a hole rather than a slot, the change that the GM determined should have been implemented in 2005. GM will also replace the lock cylinders in the Defective Vehicles because the current, defectively designed ignition cylinder allows the key to be pulled out while the vehicle is still running.

109. Not only is GM's recall ten years too late, it is insufficient to correct the safety-related defects in the Defective Vehicles.

110. Old GM knew since at least 2005, that simply replacing the ignition switches on the Defective Vehicles was not a solution to the potential for the key to inadvertently turn from the "run" to the "accessory/off" position in these vehicles. GM has known this since its inception as a legal entity. Even the necessary modifications GM is now undertaking with respect to the Defective Vehicles' ignition cylinder and keys are insufficient to make the Defective Vehicles safe or restore their value.

111. GM's recall fails to address the design defect that causes the key fob/chain to hang too low on the steering column and fails to address the defective Airbag System, which disables the airbag immediately upon the engine shutting off. Thus, even when the ignition switches, cylinders, and keys are replaced, a defective condition will still exist in the Defective Vehicles and there continues to be the potential for a driver to contact the key chain and inadvertently turn the key from the "run" to the "accessory/off" position.

112. Although GM contends that it changed the ignition switch in some 2007 Cobalts and most of the 2008-2010 Cobalts, there continue to be non-deployment events in the later model Cobalts—. Undermining GM's position is GM's own investigation into the non-deployment events in Cobalts, which identifies over 250 non-deploy crashes involving 2008-2010 Cobalts.

113.    GM's engineers understood that increasing the detent in the ignition switch alone was not a solution to the problem, and chose to conceal this information from the public, including Named Plaintiff, and the serious nature and pervasive of the defects, which the current recall will not cure.  This concealment proximately caused the serious injuries and death of the Named Plaintiff.

114.    At last, GM notified owners and lessees of the Defective Vehicles by letter in late February and March of 2014.  GM's recall letter minimized the risk of the defect, indicating that its ignition problems would occur only "under certain conditions" and emphasized that the risk increased if the "key ring is carrying added weight . . . or your vehicle experiences rough road conditions."

### *GM Suspends Employees and Enters Consent Order with the NHTSA*

115.    On April 10, 2014, GM announced that it was suspending Ray DeGiorgio, the lead design engineer for the Cobalt and Ion ignition switch, and Gary Altman, GM's program-engineering manager for the Cobalt, for their respective roles in GM's safety failure.

116.    This announcement came after Ms. Barra was briefed on the results of former United States Attorney Anton R. Valukas's internal investigation of the company, which was conducted in response to growing concerns regarding the safety of the Defective Vehicles.

117.    GM has also suspended Carmen Benavides, director of product investigations, for her role in GM's safety failure.  Jim Federico, who led the 2012 investigation into airbag non-deployment, has left the company and taken another position.

118.    On May 16, 2014, GM agreed to a civil penalty of $35 million—the maximum permitted by law—for its failure to timely notify NHTSA of the ignition switch defect.  As part

of its agreement, GM agreed to implement numerous internal reforms to improve its response to product defect issues in the future.

### *GM Creates Woefully Inadequate Settlement Fund*

119.   GM had acknowledged that the ignition switch defect has caused at least thirteen deaths and over 50 accidents.  Independent safety groups put this number far higher: the Center for Auto Safety, for example, estimates that there have been 303 deaths associated with the Saturn Ion and Chevrolet Cobalt vehicles alone.  The actual number of deaths and accidents for all Subject Vehicle models is expected to be significantly higher than GM's estimate.

120.   In April 2014, under intense scrutiny from Congress and the Department of Justice, Mary Barra announced that GM would retain attorney Kenneth Feinberg to implement a claims facility to amicably resolve personal injury and wrongful death claims associated with the ignition switch defect.  Ms. Barra's announcement was greeted with much fanfare on Capitol Hill and in the press.

121.   On June 30, 2014, Mr. Feinberg unveiled the GM Ignition Compensation Claims Resolution Facility (hereinafter the "GM Claims Facility" or "Facility").  The GM Claims Facility purported to offer compensation to three categories of victims:

- Those who were killed in an accident involving certain Subject Vehicles;

- Those who suffered a "Category One" injury in an accident involving certain Subject Vehicles. A Category One injury is defined as a "quadriplegic injury, paraplegic injury, double amputation, permanent brain damage requiring continuous home medical assistance, or pervasive burns encompassing a substantial part of the body"; and

- Those who suffered a "Category Two" injury in an accident involving certain Subject Veh1cles. A Category Two injury is generally defined as an injury requiring one or more nights of hospitalization within 48 hours of the accident.

122.    In addition to these injury thresholds, the GM Claims Facility did not treat all Subject Vehicles equally. Rather, individual claimants injured or killed in accidents involving any Subject Vehicle of model year 2007 or earlier were reported to be eligible for compensation. Claimants in Subject Vehicles whose model year is 2008 or later, however, were eligible only upon proof that (i) the original ignition switch was replaced prior to the accident in question, and (ii) the replacement switch was one bearing Part Number 10392423.

123.    According to the GM Claims Facility FAQ, this distinction makes sense because Subject Vehicles of model year 2007 and earlier "had defective ignition switches installed at the time of manufacture."  Subject Vehicles whose model year is 2008 or later, however, allegedly "did not have defective ignition switches installed during manufacture."  GM has thus taken the position (and excluded from eligibility) those Subject Vehicles that were manufactured with the ignition switches as redesigned by Ray DeGiorgio in 2006.  In other words, GM (and the Facility it implemented) denies that the ignition switches were still defective following DeGiorgio's redesign.

124.    Thus, GM refuses to acknowledge what GM's engineers have long known: the defect in the ignition switches is not limited to inadequate torque performance, but also includes the low placement of the ignition on the steering cylinder as well as the airbag system that is disabled when the ignition is in the "accessory" or "off" position.  GM's FPE team recognized these essential aspects of the safety defect as recently as 2012 when they proposed placing a shroud over the ignition and/or moving the ignition higher on the steering column.

125.    Even if the ignition switch defect were purely an issue of inadequate torque performance, however, the evidence shows that the ignition switches were defective even after DeGiorgio's 2006 redesign.  In May of 2012, GM's FPE team tested the ignition switches in

dozens of Subject Vehicles, many of them model years 2008 and 2009. In these tests, GM engineers found that the ignition switches for these 2008 and 2009 model year Subject Vehicles by and large failed to meet GM's torque specifications for the ignition switch.

126.    Further, GM's own investigation into airbag non-deployment events in Chevrolet Cobalt vehicles identified over 250 non-deploy crashes involving 2008-2010 Cobalts.  Upon information and belief, GM has had knowledge of numerous non-deploy incidents in Subject Vehicles of model year 2008 and later in which the ignition switch was not replaced prior to the relevant incident.  Although these vehicles have exhibited evidence of the ignition switch defect, they are not eligible for compensation from the Claims Facility.

127.    More surprising, until GM recalled 2008 and later model Subject Vehicles, it had never notified the owners of those vehicles, including Named Plaintiff, that they should remove all items from their keychains and/or avoid jarring road conditions or contacting the ignition key with one's knee.  GM knew that any of these scenarios could cause the ignition switches in later model year Subject Vehicles to fail, but it did nothing to notify Named Plaintiff or customers of these facts.

128.    In truth, the problems in earlier model year Subject Vehicles and later model year Subject Vehicles are the same.  The ignitions are placed dangerously low on the steering column, and the torque required to hold the ignition key in place under normal driving conditions is insufficient.

129.    GM's arbitrary exclusion of these vehicles is simply an attempt to contain its litigation tactic that belies GM CEO Mary Barra's public statements. In her April 1, 2014 testimony before Congress, Ms. Barra assured legislators and the public that:

> General Motors want[s] to do the right thing for our customers, and that's why we feel this is an extraordinary situation.... [W]e will make the best decisions for our customers,

33

recognizing that we have legal obligations and responsibilities as well as moral obligations. We are committed to our customers, and we are going to work very hard to do the right thing for our customers.

Ten weeks later, Ms. Barra continued with her public assurances, telling Congress that GM "want[s] to capture [in the Facility] every single person who has suffered serious physical injury or lost a loved one" as a result of the defective ignition switches.

130.    GM's assurances are cold comfort for Dion Lancia who lost his parents. Instead of fulfilling its assurances, GM waited until June 30, 2014, after congressional and public pressure had significantly subsided, to announce an artificial distinction between vehicles that are recalled for precisely the same defect with precisely the same disastrous safety risks. GM's exclusion of Named Plaintiff's vehicle and others like it is highly suspect and calls into question the commitment of GM to its victims and shows that the Claims Facility is not a viable remedy for many victims of GM's defective vehicles.

131.    .    The ignition switch in Maureen Lancia's 2008 Chevrolet HHR was defective. These defects proved costly, causing Named Plaintiff's death.  Once again, GM has offered half-measures where it should fully and completely rectify its past mistakes.

### *GM Admits to Fraudulent Activity and Enters Plea Deal with the Federal Government*

132.    Through the course of litigation, it has been further verified that GM was aware of  these problems year after year and nationwide, as reflected not only by the internal documents reflecting knowledge and cover-up at high levels, but also in thousands of customer complaints recorded in GM's internal complaint logs and documents. GM received and reviewed complaints of safety issues from customers with Subject Vehicles in nearly every state nationwide. Documents produced by GM pursuant to Order No. 12 in *In re General Motors LLC Ignition Switch Litigation* (14-MC-2543, Dkt. No. 46) show that GM was aware of customer complaints of stalling Subject Vehicles in many of these states and ultimately did

nothing about them.  These complaints, of course, are in addition to the multiple non-deploy fatalities of which GM became aware and even investigated from July 2009 to present.

133.    In addition to its internal documents proving its culpability, on September 17, 2014, GM entered a criminal plea agreement with the United States Department of Justice and agreed to pay a penalty of $900 million dollars in order to escape criminal liability for criminal conduct.

134.    As a part of its plea agreement, GM admitted to fraudulently concealing the ignition switch defect.

## VI.    TOLLING OF STATUTES OF LIMITATION

135.    The Named Plaintiff repeats, reiterates, and re-alleges each and every allegation of this First Amended Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

136.    Old GM sold the 2008 Chevrolet HHR at issue in these cases years prior to the filing of these actions. Any statutes of repose or limitation are tolled, however, because of New GM's fraudulent concealment of the ignition switch defect, and conduct equivalent to that required for a finding of willful and wanton conduct against GM.

137.    Further, GM was under a continuous duty to disclose to Named Plaintiff the  true character, quality, and nature of the Subject Vehicle.  GM actively concealed the true character, quality, and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicle.  Named Plaintiff reasonably relied  upon GM's knowing and affirmative representations that the Subject Vehicle was safe.  Based on the foregoing, GM is estopped from relying on any statutes of limitations in defense of this action.

35

138.    Further, Named Plaintiff had no realistic ability to discern that her vehicle was defective.   Named Plaintiff had no reason to know the sudden loss of power and the front airbags failing to deploy were caused by a defect in the ignition switch because of GM's active concealment of the ignition switch defect and failure to recall the vehicles prior to the crashes.

## VII.   CLAIMS OF RELIEF

### FIRST CAUSE OF ACTION AS AGAINST GM
### (STRICT LIABILITY – DESIGN DEFECT & FAILURE TO WARN)

139.    The Named Plaintiff repeats, reiterates, and re-alleges each and every allegation of this First Amended Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

140.    These Claims are brought by Dion Lancia as Personal Representative of the Estate of Maureen Lancia under Oklahoma law.

141.    GM designed, inspected, selected, tested, manufactured, assembled, equipped, marketed, distributed the 2008 Chevrolet HHR ("Defective Vehicle"), and its ignition switch systems and components. To the extent Old GM designed, inspected, selected, tested, manufactured, assembled, equipped, marketed, distributed, and sold the Defective Vehicle, however, New GM assumed liability for Old GM's conduct and therefore stands in Old GM's shoes for purposes of strict liability.

142.    The Defective Vehicle was expected to and did reach users, consumers, and Named Plaintiff without substantial change in the condition in which they were sold.

143.    GM had a legal duty to design, inspect, test, manufacture, and assemble the Defective Vehicle so that it would be reasonably crashworthy and provide a reasonable degree of occupant safety in foreseeable collisions occurring in the highway environment of its expected use. To the extent Old GM had a legal duty to design, inspect, test, manufacture, and assemble

the Defective Vehicle so that it would be reasonably crashworthy and provide a reasonable degree of occupant safety in foreseeable collisions occurring in the highway environment of its expected use, New GM assumed liability for Old GM's conduct and therefore stands in Old GM's shoes for purposes of strict liability.

144.    Among other things, the Defective Vehicles is not crashworthy, are defective, and/or are unreasonably dangerous and unsafe for foreseeable users and occupants in each of the following particulars:

(a) the ignition switch allows the Defective Vehicle to stall or lose engine power, power steering, and/or power braking while in normal and foreseeable operation;

(b) the Defective Vehicle has ignitions that are placed in a position so that it is common and foreseeable for a driver to impact the ignition with his or her knee, thereby moving the ignition switch from the "run" to the "accessory" or "off" position; and

(c) the Defective Vehicle has front airbags that do not deploy when the ignition is in the "accessory" or "off" position.

145.    GM's design of the ignition switch on the Defective Vehicle constitutes a design defect.  A safer, practical, alternative design was available at the time the product was manufactured and commercially feasible.  The magnitude of the danger of ignition switch defects, including bodily injury and/or death, outweighs the cost of avoiding the danger, which GM itself once estimated at approximately $1.00 per vehicle.

146.    GM had the duty to warn Named Plaintiff that it knew, or reasonably should have known, that the Defective Vehicle was unreasonably dangerous when put to their intended use—driving.

147.    The risk of harm from defective ignition switches is one that an ordinary consumer would not expect to encounter when driving a vehicle.  An ordinary consumer would expect airbags to deploy upon impact and/or power steering and brakes to be functional.

148.    GM failed to timely and/or adequately warn Named Plaintiff regarding the dangers and hazards associated with operating the Defective Vehicle.  The crashes suffered by Named Plaintiff due to ignition switch defects occurred years and months before GM finally admitted the defective condition of the vehicles.   This failure proximately caused Named Plaintiff to suffer severe bodily injuries and death.

149.    GM had a post-sale duty to warn Named Plaintiff about the dangerous propensities of its Defective Vehicle when GM acquired knowledge or had a reasonable opportunity to learn about the defect.

150.    The faulty design and failure to warn of the Defective Vehicle was the proximate cause of Named Plaintiff's damages, as discussed above, thus rendering GM strictly liable for compensatory and punitive damages, fair and reasonable damages, and damages as may be determined by the Court or jury, as well as for costs, expenses, and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION AS AGAINST GM
## (NEGLIGENCE)

151.    The Named Plaintiff repeats, reiterates, and re-alleges each and every allegation of this First Amended Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

152.    These Claims are brought by Dion Lancia as Personal Representative of the Estate of Maureen Lancia under Oklahoma law.

153.    GM was negligent in designing, inspecting, testing, manufacturing, assembling, marketing, selling, and providing warnings for the 2008 Chevrolet HHR ("Defective Vehicle"), as set forth in the paragraphs above. To the extent that Old GM designed, inspected, tested, manufactured, assembled, marketed, sold, and provided warnings for Defective Vehicle, GM assumed liability for Old GM's negligence and therefore stands in Old GM's shoes for purposes of negligence liability.

154.    GM owed Named Plaintiff a duty to design, manufacture, fabricate, assemble, inspect, market, distribute, sell, and/or supply products in such a way as to avoid harm to persons using them such as Named Plaintiff.

155.    GM owed the Named Plaintiff a duty to detect known safety defects in GM vehicles.

156.    GM owed the Named Plaintiff a duty, once it discovered the ignition switch defect, to provide thorough notice of the defect, including a warning that the defective vehicles should not be driven until an appropriate repair procedure is developed and performed.

157.    GM owed the Named Plaintiff a duty, once it discovered the ignition switch defect, to ensure that an appropriate repair procedure was developed and made available to drivers.

158.    GM knew that their customers, such as Named Plaintiff, expect that the company will employ all reasonable efforts to detect safety defects, warn drivers of their existence, and develop and make available an appropriate repair procedure.

159.    GM was aware that by providing maintenance and repair information and assistance, including through its authorized dealerships, GM had a responsibility to Named Plaintiff and other drivers to take the reasonable measures listed above.

160.    Independent of any failures by Old GM as described herein, between July 10, 2009 and March 2014, New GM breached its duties to Named Plaintiff by failing to provide appropriate notice of and repair procedures for the ignition switch defect in Named Plaintiff's vehicle. In doing so, New GM departed from the reasonable standard of care required of it.

161.    It was foreseeable that if New GM did not provide appropriate notice and repair procedures for the defect, the Named Plaintiff and other drivers would be endangered.

162.    The Named Plaintiff's injuries were reasonably foreseeable to Old GM and New GM.

163.    The Named Plaintiff could not through the exercise of reasonable diligence have prevented the injuries caused by Old GM and New GM's negligence and gross negligence.

164.    Old GM and New GM's acts and omissions, when viewed objectively from the actor's standpoint, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others. Old GM and New GM nevertheless proceeded with conscious indifference to the rights, safety and welfare of others.

165.    GM's negligence proximately caused the damages sustained by Named Plaintiff, as set forth above, and rose to the level of gross negligence, thus rendering GM liable for compensatory and punitive damages. GM is further liable for fair and reasonable damages for pain and suffering, medical expenses, and/or damages as may be determined by the Court or the jury, as well as costs, expenses, and reasonable attorneys' fees.

## THIRD CAUSE OF ACTION AS AGAINST GM
## (<u>VIOLATION OF OKLAHOMA CONSUMER PROTECTION ACT</u>)

166.    The Named Plaintiff repeats, reiterates, and re-alleges each and every allegation of this First Amended Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

167.    These Claims are brought by Dion Lancia as Personal Representative of the Estate of Maureen Lancia under Oklahoma law.

168.    Through its actions, GM violated Oklahoma's Consumer Protection Act, Okla. Stat. Tit. 15 § 753 (8)(20) by representing, knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another, and/or committed an unfair or deceptive trade practice as defined in Okla. Stat. 15 § 752(13) by misrepresenting the safety of the vehicles it manufactured, marketed and sold and/or omitted to timely inform Maureen Lancia of the dangers of the ignition switch defect, which they relied upon to their detriment.

169.    This deceptive practice occurred in the course of GM's business.

170.    Consumer, Maureen Lancia, suffered the ultimate injury in fact.  Because of GM's deceptive trade practice, Mario Lancia continued to drive in their Chevrolet HHR and both died as a result of a crash caused and/or exacerbated by its ignition switch defect.

171.    GM's deceptive trade practices regarding the ignition switch defect caused the damages sustained by the Maureen Lancia, as set forth above, thus rendering GM liable for compensatory and punitive damages and all multiples of damages available under the act. GM is further liable for fair and reasonable damages for pain and suffering, medical expenses, and/or damages as may be determined by the Court or the jury, as well as costs, expenses, and reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION AS AGAINST GM
## <u>(WRONGFUL DEATH)</u>

172.    The named Plaintiff repeats, reiterates, and re-alleges each and every allegation of this First Amended Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

173.    These Claims are brought by Dion Lancia as Personal Representative of the Estate of Maureen Lancia under Oklahoma's Wrongful Death Statute.

174.    Dion Lancia brings this Claim on behalf of the Estate of Maureen Lancia and for the benefit of their lawful beneficiaries.

175.    As a direct and proximate result of GM's conduct in manufacturing defective ignition switches and concealing this defect for ten years, Maureen Lancia suffered loss of capacity of the enjoyment of life, loss of earnings, loss of ability to earn, funeral expenses, and death.

176.    As a direct and proximate cause of GM's conduct, Maureen Lancia's beneficiaries have incurred medical expenses, estate administration expenses, and other economic losses and losses of consortium as a result of her death.  Dion Lancia brings this claim on behalf of Maureen Lancia's lawful beneficiaries for these damages and for all pecuniary losses under applicable Oklahoma statutory and/or Oklahoma common laws.

## FIFTH CAUSE OF ACTION AS AGAINST GM
## <u>(PUNITIVE DAMAGES)</u>

177.    The Named Plaintiff repeats, reiterates, and re-alleges each and every allegation of this First Amended Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

42

178.    These Claims are brought by Dion Lancia as Personal Representative of the Estate of Maureen Lancia under Oklahoma law.

179.    Named Plaintiff further alleges that they will show, by clear and convincing evidence, how GM consciously and willfully engaged in fraud, suppression, wantonness, and/or malice in concealing the ignition switch defects, of which GM knew about for several years.  By failing to recall the Defective Vehicles in a timely manner, GM caused Named Plaintiff's injuries and/or deaths.  As described in detail in this First Amended Complaint, Named Plaintiff's life has been cut short as a direct result of GM's flagrant conduct, which warrants the imposition of punitive damages.

Date: March 19, 2018                               Respectfully Submitted,

                                                   /s/ Jay W. Eisenhofer
                                                   **GRANT & EISENHOFER, P.A.**
                                                   Jay W. Eisenhofer
                                                   Thomas V. Ayala *(pending admission pro hac)*
                                                   Stephanie S. Riley *(pending admission pro hac)*
                                                   123 Justison Street
                                                   Wilmington, DE 19801
                                                   Tel: (302) 622-7000
                                                   Fax:  (302) 622-7100
                                                   jeisenhofer@gelaw.com
                                                   tayala@gelaw.com
                                                   sriley@gelaw.com